UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KATHLEEN M. HORSKY,               )
                                  )
        Plaintiff,                )        No. 12 C 208
                                  )
        v.                        )        Magistrate Judge Sidney I. Schenkier
                                  )
MICHAEL J. ASTRUE, Commissioner,  )
                                  )
                                  )
        Defendant.                )
                                  )

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff, Kathleen M. Horsky, seeks review of the final decision by the Commissioner of

Social Security ("Commissioner") denying her application for benefits. She has filed a motion

seeking reversal and/or remand of the decision (doc. # 15). The Commissioner, in turn, has filed a

motion seeking summary affirmance of that decision (doc. # 20). For the reasons set forth below,

the Court grants the Commissioner's motion to affirm and denies Ms. Horsky's motion to remand.

I.

We begin with the procedural history of this case. On January 17, 2007, Ms. Horsky applied

for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging that

she became unable to work due to her disabilities on the onset date of June 23, 2006 (R. 131-41).[2]

Her disability applications were denied initially and upon reconsideration, and Ms. Horsky sought

and received a hearing before an administrative law judge ("ALJ"), which took place on March 11,

---

[1]On April 26, 2012, by consent of the parties and in accordance with 28 U.S.C. § 636(c), this matter was reassigned to this Court for all further proceedings, including the entry of final judgment (doc. # 13).

[2]We note that despite the documents in the record indicating that she applied for benefits on January 17, 2007, Ms. Horsky and the ALJ stated that she filed for disability on December 11, 2006 (R. 17). This discrepancy does not affect the analysis in this case.

2010 (R. 33). On April 16, 2010, the ALJ issued a written decision denying benefits and finding Ms. Horsky not disabled under the Social Security Act ("the Act"). The Appeals Council denied review on November 15, 2011 (R. 1), making the ALJ's decision the final decision of the Commissioner. 20 C.F.R. § 404.981. *See Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We next summarize the administrative record. We set forth the general background in Part A, followed by the medical record in Part B. In Part C, we discuss the hearing testimony, and we address the ALJ's written opinion in Part D.

## A.

Until she quit her job in May 2006, Ms. Horsky was employed as a patient care technician with various healthcare providers, which included reading patients' vital signs, drawing blood, and helping patients up and off carts (R. 50-51, 197). Then, on June 23, 2006, when Ms. Horsky was 41 years old, she injured her right knee when she stepped into a 17-inch deep sinkhole (R. 258). After the accident, she worked for a week at Target, but she could not perform the heavy lifting from stocking shelves or the long periods of sitting and standing required of cashiers (R. 52-54).

## B.

During her alleged period of disability, Ms. Horsky has been treated by various physicians, a chiropractor, and a physical therapist. Orthopedist Joseph Thometz, M.D., treated Ms. Horsky as early as September 2003, when she complained of pain in both knees (R. 315). She also visited him on February 7, 2005, complaining of lower back pain after falling on ice in November 2004 (*Id.*). Upon examination, she had no tenderness in her lower back, but some over the left sacroiliac ("SI")

joint (between the spine and pelvis) (*Id.*). Dr. Thometz stated that Ms. Horsky had lumbar strain, which was improving (*Id.*).

Dr. Thometz also saw Ms. Horsky in July 2006. At that time, she complained of pain, weakness, and buckling in her right knee (R. 266). X-rays of the right knee were unremarkable (*Id.*). Dr. Thometz assessed her with right knee strain and recommended physical therapy (*Id.*).

On April 5, 2007, Ms. Horsky visited orthopedic surgeon Richard Lim, M.D. Examination showed tenderness in her spine over her right SI joint, but she had full flexion, no atrophy or edema, and normal gait and stance (R. 288). Dr. Lim noted that chiropractic care had improved Ms. Horsky's symptoms some (R. 289). On April 23, 2007, she had an SI joint injection (R. 287), but on May 17, 2007, she reported that the injection had not helped her (*Id.*). Dr. Lim stated that: "Unfortunately when you look at her entire clinical picture, there is really nothing from a surgical standpoint that I have to offer her. Her lumbar spine shows minimal nerve root compression and in fact I doubt that her symptoms are all entirely related to her spine" (*Id.*). He did not think Ms. Horsky had radiculopathy (R. 303). In July 2007, Ms. Horsky received some physical therapy for her back, but with little or no improvement (R. 296-302). In October 2007, she reported that her pain was so severe in her back and legs that she could no longer perform any household chores and had trouble tying her shoes (R. 243-44).

On June 5, 2007, state agency doctor Towfig Armand, M.D., addressed Ms. Horsky's claims of low back problems and right knee injury, and he found that her impairments were not severe (R. 292). He relied on Dr. Lim's April 5, 2007 examination, which showed full range of motion in her back and knee, and normal strength with no evidence of enlargement or tenderness, though the

3

epidural injection produced little relief (R. 294). On October 5, 2007, upon reconsideration, state agency doctor Virgilio Pilapil, M.D., affirmed Dr. Armand's decision as written (R. 309).

Earlier that year, on February 21, 2007, Ms. Horsky also reported having migraine headaches (R. 275), and on May 9, 2007, she also complained of anxiety problems due to her medical condition (R. 273). In October 2007, she stated that because of her anxiety, she fears being alone and only leaves the house about twice a week for appointments (R. 244-45). However, Ms. Horsky reported that she still enjoyed being with people (*Id.*).

The record does not indicate that Ms. Horsky received any medical attention between October 2007 and May 2008. In May 2008, Ms. Horsky again complained of lower back and right leg pain, as well as anxiety, panic disorder, and migraines (R. 434-37). On July 11, 2008, Ms. Horsky visited neurologist Jasvinder Chawla, M.D. She rated the pain in her lower back and radiating to her lower extremities at a level of ten out of ten (R. 430). Upon examination, Ms. Horsky had tenderness and reduced range of motion in her lower spine and bilateral SI joints, but her gait and station were normal (R. 432-33). On July 18, 2008, her internist, Stephen Gawne, M.D., prescribed fluoxetine (Prozac) for her panic attacks (R. 430).

On August 5, 2008, Dr. Chawla performed testing showing that Ms. Horsky had lateral femoral cutaneous neuropathy (meralgia paresthetica, or pinching of the nerve that supplies sensation to the outer portion of the thigh), ruling out injury to the lumbosacral root (nerve root at the lower part of the spine) (R. 454). On August 15, 2008, Ms. Horsky also reported bilateral upper extremity pain (ten on a scale of ten), mainly in her shoulders, making it hard to move her arms (R. 427-28).

4

On August 19, 2008, Ms. Horsky had a physical examination by Harold Rees, M.D. She complained of bilateral hip and knee pain and bilateral shoulder and upper arm pain (R. 426). Dr. Rees noted that she had an antalgic gait bilaterally and could not walk very well; however, x-rays of her knees and hips were essentially normal (R. 427). Dr. Rees opined that she had chronic pain syndrome, possibly fibromyalgia or another rheumatologic condition (*Id.*).

On August 22, 2008, Ms. Horsky reported to Dr. Gawne that she felt about 65 percent better since starting Prozac: less anxious, able to go out of the house by herself, and sleeping better (R. 425). She took Tylenol for continuing pain in her hips, low back, and right leg because nonsteroidal anti-inflammatory drugs upset her stomach (*Id.*).

On September 12, 2008, Ms. Horsky saw a rheumatologist, Rodney Tehrani, M.D., for the first and only time. She reported that in the two years since she fell into a sinkhole, her original right knee pain has spread to her low back, right thigh, groin, and upper extremities (R. 422-23). She stated that she has pain in all muscles and joints and wakes up ten to twelve times nightly (R. 423). Ms. Horsky reported that a steroid injection did not help the pain and just caused her anxiety, and pain medications make her vomit so she can only take Tylenol for her pain (*Id.*). Dr. Tehrani found that all of her fibromyalgia trigger points were tender to palpitation (*Id.*). He opined that she had early degenerative joint disease with symptoms compatible with superimposed fibromyalgia (*Id.*). Dr. Tehrani prescribed Lyrica and Vitamin D (*Id.*).

On October 24, 2008, Dr. Gawne reviewed Dr. Chawla's and Dr. Tehrani's findings, and he noted that Ms. Horsky had not started taking either the prescribed Vitamin D or Lyrica (R. 421). Dr. Gawne encouraged her to take the Vitamin D as Dr. Tehrani recommended and to consider a trial of Lyrica to address her muscle and soft tissue pain secondary to fibromyalgia (R. 422). He also

noted that Ms. Horsky's panic disorder was improved, and he opined that her meralgia paresthetica was more of a nuisance than a serious medical condition (*Id.*).

On November 21, 2008, Ms. Horsky visited Dr. Chawla. She reported that her upper extremity, low back, and hip joint pain was at almost a ten on a scale of ten (R. 420). Ms. Horsky stated that she tried taking Lyrica, but stopped because of nausea (*Id.*). Dr. Chawla recommended that she try a reduced dose of Lyrica to avoid side effects, and he advised her to maintain follow-up appointments with her rheumatologist (R. 421). He observed that she had an antalgic gait, and he advised her to get physical therapy (R. 420-21).

On February 23, 2009, Ms. Horsky complained to Dr. Chawla of hip and shoulder pain that she rated at a nine to ten on a scale of ten (R. 418). An MRI of her lumbar spine showed mild central disk herniation at L4-5 (*Id.*). Her gait was antalgic, and her upper and lower limb strength was limited due to pain (R. 419). She had tenderness in her whole spine, shoulders, elbow, knees, and hips (*Id.*). Dr. Chawla again advised Ms. Horsky to maintain follow-up appointments with her rheumatologist and to get physical therapy (*Id.*).

At an appointment with Dr. Gawne on March 5, 2009, Ms. Horsky continued to report pain in her hips, which was making it hard for her to sleep (R. 351). She reported that she stopped taking Lyrica after only two pills because it made her feel sick (*Id.*). She did not take the Vitamin D supplement either because it made her sick to her stomach (*Id.*). Ms. Horsky also stopped taking Prozac because she thought it made her feel groggy in the morning, but she was still taking Xanax (*Id.*). Ms. Horsky reported that her migraines have become more frequent, and they incapacitate her (*Id.*). Her husband wanted her to go back on Prozac because he thought it helped with her migraines

(*Id.*). Dr. Gawne noted that "[s]he has fallen a few times due to clumsiness and had difficulty getting back up which she wants to attribute to neuropathy" (R. 353).

That month, Ms. Horsky also requested a letter from Dr. Gawne excusing her husband from work so he could stay home to care for her when she had severe migraines one to two times per month (R. 362). Dr. Gawne stated that such a request was "unusual" because though migraines can be incapacitating, they do not usually require an assistant; as such, he noted that he is "unwilling to write any further letters concerning this matter" (*Id.*).

On March 25, 2009, Dr. Tehrani wrote a letter describing Ms. Horsky's September 12, 2008 appointment (R. 331). In the letter, he stated that upon examination, Ms. Horsky had tenderness to all trigger points, but no inflammatory joints, and she was diagnosed with fibromyalgia and prescribed a trial of Lyrica and Vitamin D replacement therapy (*Id.*). Dr. Tehrani stated that he did not know if there was any improvement in her condition because she has made no follow-up visits (*Id.*).

The record also contains notes from chiropractor Gerald Helwig, D.C., from March to June 2009. His notes state that Ms. Horsky complained of pain, numbness, and limited motion in her lumbar and cervical spine, buttocks, calf, and right heel, and he observed tenderness and pain on palpitation of her neck and spine (R. 340-41). Treatment consisted of very gentle adjustive procedures administered to the cervical spine, lumbar spine, and right sacrum (R. 341-47).

In June and August 2009, Ms. Horsky had additional visits to Dr. Gawne, where she continued to report anxiety, fibromyalgia, pain, and migraine headaches. Dr. Gawne observed no motor deficits and normal gait, mood, affect, and behavior (R. 370). In August 2009, Ms. Horsky reported taking Prozac again (R. 387).

7

On February 24, 2010, at the request of Mrs. Horsky and her husband, Dr. Gawne filled out a form to excuse Mr. Horsky from work on the occasional days he will have to stay home to care for his wife when her migraine headaches cause nausea, vomiting, and weakness, such that she cannot get out of bed and will need help walking to the bathroom and caring for herself and her pets (R. 413-14). Dr. Gawne noted that Ms. Horsky has had migraine headaches for many years and has had chronic back pain and fibromyalgia for three to four years (R. 413). He stated that he could not predict how long she will continue to experience migraines as she has not tolerated prophylactic medications to decrease their frequency (R. 414).

## C.

A hearing was held before the ALJ on March 11, 2010 (R. 32). Ms. Horsky, Medical Expert ("ME") Ashok Jilhewar, and Vocational Expert ("VE") Melissa Benjamin testified.

Ms. Horsky testified that prior to June 2006, she was upbeat, working 70 hours a week, doing housework, and going for long walks (R. 37). That month, however, she stepped into a sinkhole and injured her right leg (*Id.*). About five days after the accident, she starting having spasms in her lower back that would last throughout the day (R. 38). She saw a chiropractor for two years, but that did not help the pain (*Id.*). She feels pain in her groin and in her right leg, down to her foot, which constantly falls asleep (R. 39). Her fibromyalgia affects all parts of her body; she feels severe pain in her legs, arms, back, and neck (*Id.*). She received injections twice in her back, but they did not ease the pain (R. 40-41). Her pain only went away with the numbing medication (R. 40). She resisted her doctors' suggestions to try physical therapy because her whole body feels bruised, and she does not want anyone to touch her (R. 41).

Ms. Horsky testified that she also has neuropathy (nerve damage) above the right knee which causes a very sharp pain up and down the front and back of her leg and puts her leg to sleep (needles and pins) so she no longer drives (R. 44). Her doctors have prescribed gabapentin, Lyrica, Darvocet, and Vicodin to treat the pain, but they caused nausea and vomiting, so she only takes Excedrin or Tylenol for the pain (R. 44-45).

Since the June 2006 accident, Ms. Horsky stated that she gets six to eight migraine headaches a month (R. 42). When she has a migraine, her head feels like it is going to explode; she avoids light and sound, lays on the bed, and stays near a bathroom because of nausea and vomiting (R. 42-43). Her migraines can last a full day and go into a second day (R. 43). She currently takes 40 milligrams of Relpax for the pain, because Maxalt did not help as much (R. 42). She testified that migraine medication makes her feel a little loopy, so she has to lay down a bit when she takes it (R. 53).

Ms. Horsky testified that due to anxiety, she does not like to go places by herself (R. 45-46). She takes a combination of Xanax and Prozac, which "really help[s] [her] a lot" (R. 46). The day before the hearing, she took Xanax and Relpax (R. 57). Her doctors have not given her a prognosis, but she stated that "everything is chronic" – back pain, migraines, and fibromyalgia (R. 49).

Ms. Horsky stated that she can typically stand without feeling any pain for about 15 minutes and can only walk about a quarter of a block at a time (R. 46-47). She has a cane, but it is not doctor prescribed (R. 55). She can lift about five pounds, but she has pain in her arms trying to lift more than that (R. 47-48). She has severe back pain when she bends, stoops, or crouches (R. 48).

Ms. Horsky testified that her husband helps her bathe and dress, because she cannot really do anything alone (R. 48). She stays in her pajamas and eats a TV dinner if her husband is at work (*Id.*). She watches television all day and does nothing for fun, though she can sit comfortably for

only about five minutes (R. 55-56). Friends and family may come visit her at the house, but she does not go out (R. 55). Ms. Horsky occasionally cooks simple meals and washes dishes, but she never sweeps, mops, vacuums, drives, gardens, or does laundry (R. 54-55).

The ME, an internist, testified next. He first gave a summary of the medical record, including MRI scans of Ms. Horsky's back and legs, reports by orthopedic surgeons, physical therapy notes, her visit to the rheumatologist, as well as her medications and their side effects (he did not know how to interpret notes from her chiropractor) (R. 58-63). The ME could not determine the "status" of Ms. Horsky's migraine headaches because though she took medication for acute attacks of migraines, she did not take any medication to prevent them. Standard practice is to take prophylactic medication if a person has more than two migraines a month (R. 62, 64). The ME offered no opinion as to whether her condition meets or equals a listed impairment, and he did not review any state agency consultative opinions (R. 63). Ultimately, the ME opined that Ms. Horsky would be limited to sedentary work, but she cannot crouch, kneel, or crawl, use ladders or ropes, and can only occasionally climb stairs (*Id.*).

The VE testified that Ms. Horsky's past work was as a medical assistant, which she performed at a light, semi-skilled level (R. 66). Assuming an individual of the claimant's age, education, and work experience, limited to sedentary work, with no climbing ladders, ropes or scaffolds, no kneeling, crouching or crawling, occasional climbing ramps and stairs, and occasional balancing and stooping, the VE testified that the past relevant work would not be available (*Id.*). Other sedentary work in the Chicago Metropolitan area would be available – appointment clerk (approximately 30,000 positions), information clerk (approximately 25,000 positions), and order

10

clerk (approximately 6,000 positions) (*Id.*). However, an individual who would be off task for more than fifteen percent of the day would not be able to perform full time work (R. 68).

### D.

In her written opinion, dated April 16, 2010, the ALJ found that Ms. Horsky was not disabled under the Act (R. 16). In evaluating Ms. Horsky's claim, the ALJ applied the standard five-step sequential inquiry for determining disability, which required her to analyze whether the claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment that meets or equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) can perform her past work; and (5) is capable of performing other work in the national economy. *See* 20 C.F.R. § 404.1520(a)(4); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). If the ALJ finds at Step 3 that the claimant has a severe impairment that does not equal one of the listed impairments, she must assess and make a finding about the claimant's residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(e). The ALJ then uses the RFC to determine at Steps 4 and 5 whether the claimant can return to her past work or different available work in the national economy. 20 C.F.R. § 404.1520(e)-(g). The claimant bears the burden of proof at Steps 1 through 4, but the burden shifts to the Commissioner at Step 5. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

Here, the ALJ found, at Step 1, that Ms. Horsky had not engaged in substantial gainful activity since June 23, 2006, the alleged onset date (R. 19). At Step 2, the ALJ found that Ms. Horsky had the following severe impairments: low back pain, migraine headaches, status post right knee injury, and fibromyalgia (*Id.*).

11

The ALJ determined that Ms. Horsky's anxiety was not severe according to the Paragraph B criteria (R. 19). She found that Ms. Horsky had only mild limitation in her activities of daily living ("ADLs") and in social functioning because Ms. Horsky "admitted that she could go out of the house by herself" (R. 20). Further, the ALJ noted that on August 22, 2008, Ms. Horsky reported that her anxiety attacks have improved since starting Prozac, and on October 24, 2008, a treating source also noted that her anxiety had improved (*Id.*). The ALJ also found mild limitation in concentration, persistence, or pace, because Ms. Horsky can follow a story line of a television show (*Id.*). She has had no episodes of decompensation of extended duration (*Id.*). Therefore, the ALJ found that Ms. Horsky's alleged impairment of anxiety was not severe (*Id.*).

At Step 3, the ALJ found that Ms. Horsky's impairments, alone or in combination, do not meet or equal a listing (R. 20). The ALJ noted that the ME found the same (*Id.*).[3] The ALJ adopted the testimony of the ME (R. 22), and determined that Ms. Horsky had the RFC to perform sedentary work, except that she should never climb ladders/ropes/scaffolds, kneel, crouch, or crawl, and she should only occasionally climb ramps/stairs, balance, or stoop (R. 20-21).

In making this determination, the ALJ reviewed Ms. Horsky's testimony regarding her low back problems, fibromyalgia, migraine headaches, and right knee injury, including her testimony that due to pain, she can only sit or stand for 30 minutes,[4] she cannot lift more than five pounds, and she

---

[3] By contrast, the transcript of the ME's testimony at the hearing states that he did not, in fact, give an opinion as to whether or not the Listings were met (R. 63). As plaintiff does not challenge the ALJ's Step 2 or 3 determination, we do not delve into this discrepancy further.

[4] The ALJ cites to an undated disability report on which Ms. Horsky wrote that thirty minutes was the most she could sit or stand (R. 21, citing R. 197). The ALJ also cites generally to Ms. Horsky's hearing testimony (R. 21), but Ms. Horsky testified that she can typically sit or stand fifteen minutes without feeling pain in her legs or back (R. 47, 56). The ALJ's failure to consider that Ms. Horsky testified to even greater functional limitations at the hearing – a limitation to fifteen rather than thirty minutes of sitting/standing – was harmless because the ALJ ultimately found that even the thirty minute limitation was excessive.

12

has a hard time sleeping (R. 21). The ALJ then compared this testimony to the objective medical records, and found that Ms. Horsky's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent" with the RFC assessment (R. 22).

The ALJ found Ms. Horsky "far less than credible" as to her claims of low back and right knee pain because x-rays showed a "normal right knee," there was no evidence of lumbosacral root injury, and MRIs showed only "mild" degeneration and herniation and "minimal" nerve root compression (R. 23). Although Ms. Horsky reported that an injection into her SI joint did not help her pain, the ALJ noted her doctor's opinion that surgery was not warranted (*Id.*). In addition, despite reporting tenderness in her spine, Ms. Horsky had no peripheral edema (swelling), and full flexion, extension, and range of motion in her spine (*Id.*). Medical records also showed normal range of motion in her hip, knee, and ankle; negative straight leg raising; good sensation in her lower extremities; normal reciprocal heel-toe gait; and normal stance (R. 23-24). Furthermore, although she testified at the hearing that she had spasms in her spine, Dr. Lim did not find such spasms, and he found no atrophy, joint enlargement, or radiculopathy (R. 23). The ALJ also stated that Ms. Horsky was participating in chiropractic care with some noted improvement in her symptoms (*Id.*).

In addition, the ALJ found that Ms. Horsky was "far less than credible" as to her claims of pain from fibromyalgia (R. 23). Notably, she only visited her rheumatologist once, and she did not take the Lyrica that he prescribed for her fibromyalgia pain (R. 22, 24). Furthermore, though she complained of diffuse body aches, including shoulder pain, and reported tenderness as to all of her

13

trigger points, she had no inflammatory joints (R. 24). The ALJ also noted that at some point, Ms. Horsky reported that she was "sleeping better" (R. 25).

The ALJ also doubted Ms. Horsky's claims that she had migraines several times a week because she told Dr. Gawne that she had only one to two migraines a month (R. 22). In addition, Ms. Horsky stopped taking Prozac even though it had apparently helped control her headaches (R. 24). Though Dr. Gawne wrote a letter at Ms. Horsky's request to excuse her husband from work when her migraines were periodically so severe she could not function without him, Dr. Gawne "expressed skepticism" because migraine sufferers usually do not require a full-time assistant, and at that time, he stated that he would not write any further letters on the matter (*Id.*; *see* R. 362).

In addition, the ALJ found Ms. Horsky's testimony that she can only sit or stand for 30 minutes and only lift five pounds was not credible because MRIs of her knee were unremarkable (R. 22, 25), and she was diagnosed only with right knee strain (R. 23). Furthermore, her doctor did not think she had radiculopathy (*Id.*), and Dr. Gawne opined that Ms. Horsky's meralgia paresthetica was "more of a nuisance than a serious medical condition" (R. 24). The ALJ also reviewed the chiropractic notes that indicated sufficient general muscular strength in Ms. Horsky's lower extremities (*Id.*). The ALJ found it important that on June 4, 2009, and September 14, 2009, a treating source noted Ms. Horsky's gait was normal and she had no motor deficits (*Id.*).

The ALJ noted that Ms. Horsky's pain medication (Darvocet) makes her sick to her stomach, and her migraine medication makes her "loopy" (R. 22). Nevertheless, the ALJ found that the side effects Ms. Horsky suffered from medications were "relatively minor" (*Id.*).

The ALJ also listed other issues that she found detracted from Ms. Horsky's credibility. The ALJ believed that Ms. Horsky had a reason to inflate her symptoms because she has a lawsuit

14

pending against the Village of Tinley Park based on her injuries from her fall into the sinkhole on June 23, 2006 (R. 23). In addition, the ALJ found inconsistent Ms. Horsky's claim that she became unable to work due to the June 23, 2006 accident, because she quit her job in May 2006 and she reported that she was a homemaker in March 2006 (R. 22). The ALJ also noted that in a form Ms. Horsky filled out in April 2009, she indicated that she could take care of her personal care needs normally, even though it allegedly caused some extra pain at times (R. 24, citing R. 339).

At Step 4, the ALJ found that Ms. Horsky could not perform her past relevant work, which was light, but at Step 5, the ALJ found that with her RFC, Ms. Horsky could perform a significant number of jobs available at the unskilled, sedentary occupational base (R. 26).

### III.

We will uphold the ALJ's determination if it is supported by substantial evidence, meaning evidence a reasonable person would accept as adequate to support the decision. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). "The ALJ is not required to address every piece of evidence or testimony presented, but must provide 'an accurate and logical bridge' between the evidence and her conclusion that a claimant is not disabled." *Kastner*, 697 F.3d at 646 (citing *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).

Initially, we note that the Commissioner's primary argument is that Ms. Horsky has waived all "challenges to [the ME's] testimony" because her attorney did not raise challenges to his testimony at the administrative hearing (doc. # 21: Comm'r Mem. at 4-5). This argument is a non-starter. Ms. Horsky's challenges on appeal to this Court are challenges primarily to the ALJ's treatment of the ME's testimony, not to the ME's testimony itself. These arguments are appropriately before this Court. *See Sherwood v. Astrue*, No. 11 C 8968, 2012 WL 5966539, at *22

15

(N.D. Ill. Nov. 28, 2012) (Commissioner's waiver argument failed because the claimant was not challenging the VE's statements but the ALJ's determination, based on the VE's testimony). Ms. Horsky's challenges to the ME testimony itself, however, are waived, and we do not consider those arguments.[5]

IV.

Ms. Horsky does not dispute the ALJ's Step 2 or Step 3 findings. Rather, she argues that the ALJ erred by adopting the testimony of the ME and finding her testimony not credible (which in turn affected the RFC determination and the finding at Step 5 that she is not disabled). We disagree. As explained below, the ALJ's decision was supported by substantial evidence.

A.

As the ALJ points out, the evidence of impairments in this case consists primarily of Ms. Horsky's own reports of pain and functional limitations. As such, the viability of Ms. Horsky's disability claim largely comes down to the weight the ALJ assigned to her testimony and reports of pain and functional limitations. "Because the ALJ is in the best position to determine a witness's truthfulness and forthrightness, this court will not overturn an ALJ's credibility determination unless it is patently wrong." *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012).

The ALJ found Ms. Horsky's allegations of pain and functional limitations to be "far less than fully credible" and summarized her findings with the oft-criticized boilerplate language: "After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements

---

[5]These waived arguments, as the Commissioner points out, include that Dr. Jilhewar's testimony included incorrect citations, "somewhat inarticulate" testimony, and undefined terms, such as "no specific ideational non-exertion limitations" (*see* Comm'r Mem. at 6-7).

concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" (R. 22).

As an initial matter, we note that Ms. Horsky contends that this boilerplate language demonstrates that the ALJ did not carefully examine the record and failed to apply the credibility factors listed in 20 C.F.R. § 404.1529(c) (doc. # 16: Pl.'s Mem. at 11-12). And, indeed, there are numerous opinions noting that this boilerplate language has been "consistently criticized." *See Roddy v. Astrue*, 705 F.3d 631, 635 (7th Cir. 2013) (collecting cases). However, we reiterate that "the use of this boilerplate does not require a remand when it merely stands as a statement of a conclusion that is otherwise sufficiently explained by the ALJ." *Folino v. Astrue*, No. 11 C 3556, 2013 WL 535524, at *7 (N.D. Ill. Feb. 11, 2013); *see also Lange v. Astrue*, No. 11 C 2958, 2012 WL 5818258, at *14 (N.D. Ill. Nov. 14, 2012) ("So long as the ALJ considers the entire record and gives specific reasons for the weight given to the individual's statements, an ALJ's credibility determination may be supported by substantial evidence despite a considerable amount of boilerplate language and recitations") (citing *Shideler*, 688 F.3d at 311).

Here, the ALJ considered the entire case record and gave specific reasons for not finding Ms. Horsky's statements credible, including considering the factors listed in Section 404.1529(c), such as the claimant's daily activities; the location, duration, frequency, and intensity of her pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; and any other treatment measures the claimant has taken to alleviate her pain or other symptoms. We explain the ALJ's credibility findings as to each category of Ms. Horsky's alleged pain and functional limitations below.

# 1.

Ms. Horsky contends that the ALJ ignored the evidence of fibromyalgia, migraine headaches, and other physical pain in the record, including her complaints of diffuse body aches and pains, difficulty performing activities of daily living, and her rheumatologist's, Dr. Tehrani's, finding that she had tenderness at all her trigger points (Pl.'s Mem. at 13-14). This argument misstates the record. The ALJ explicitly noted Ms. Horsky's complaints of migraines, Dr. Tehrani's findings, and Ms. Horsky's complaints of various fibromyalgia pain, including evidence in the record that Ms. Horsky complained to her doctors of, and testified to, severe pain in her back, leg, and shoulders that caused extensive functional limitations.

At the same time, the ALJ explained that as to her back and leg pain, x-rays showed a "normal right knee," there was no evidence of lumbosacral root injury, and MRIs showed only "mild" degeneration and herniation and "minimal" nerve root compression (R. 23). In addition, on examination, Ms. Horsky had no peripheral edema, atrophy, joint enlargement, or radiculopathy; full flexion, extension; and normal range of motion in her spine, hip, knee, and ankle (*Id.*). The ALJ also pointed out that while Ms. Horsky testified that she had migraines several times a week, elsewhere in the record she reported to her treaters that she had migraines one to two times per month (R. 24).

After considering both this subjective and objective medical evidence, the ALJ reasonably concluded that the extent of Ms. Horsky's complaints of pain and functional limitations was not credible. The ALJ explained that Ms. Horsky never sought a follow-up visit with Dr. Tehrani, and she failed to take any of the medications prescribed by him. The ALJ also noted Dr. Gawne's skepticism that Ms. Horsky needed her husband to stay home to care for her when she had migraines (R. 24). Furthermore, the ALJ found that many of the doctors' reports in the record – including Dr.

Tehrani's report of tenderness at the fibromyalgia trigger points and reports of Ms. Horsky's migraine headaches – consist in large part of Ms. Horsky's own reports of pain. This is another reasonable basis to discount Ms. Horsky's testimony. "ALJs may discount medical opinions based solely on the patient's subjective complaints." *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012) (citing *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008)).

In addition, the ALJ noted that Dr. Gawne, Ms. Horsky's treating internist, stated that meralgia paresthetica was more of a nuisance than a serious medical condition (R. 24). Ms. Horsky contends that the ALJ should not have given weight to Dr. Gawne's statement (Pl.'s Mem. at 14). However, just as an ALJ is not allowed to "cherry-pick" the evidence, *see Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010), Ms. Horsky cannot selectively use the statements of her treater that she finds favorable and discard the rest. *See Lange*, 2012 WL 5818258, at *13. Morever, contrary to Ms. Horsky's contentions, the ALJ took into account other evidence in the record as to Ms. Horsky's leg and back pain and its effects on her functional abilities, but, for the reasonable explanations set forth above, the ALJ did not find Ms. Horsky's testimony as to her limitations to be credible.

The Seventh Circuit was presented with a similar case in *Castile v. Astrue*, 617 F.3d 923 (7th Cir. 2010). In *Castile*, the ALJ had discussed reports from numerous physicians, including reports finding tenderness at the fibromyalgia trigger points, reports of migraines, and an MRI of the lumbar spine showing moderate degenerative change. *Id.* at 929. The ALJ then addressed with particularity the claimant's testimony relating to all of her alleged impairments and found that "based on objective evidence and common sense, the ALJ reasonably concluded that [the claimant's] litany of alleged pain and other symptoms were 'not entirely credible' insofar as establishing proof of her inability to work." *Id.* at 929-30. Also casting doubt on the claimant's credibility was a report from a

physician which stated that the claimant "was also very noncompliant and very co-dependent with her husband and histrionic. It was noted she had accepted the sick role with open arms, liking the attention and medicine." *Id.* at 930. Accordingly, the appellate court found that the ALJ had thoroughly examined all of the medical reports and findings. *Id.*

Here, as in *Castile*, the ALJ reviewed Ms. Horsky's testimony as to the intensity and limiting effects of her alleged physical impairments with particularity, and then supported her adverse credibility determination with specific reasons, including examples of inconsistencies between the medical record and Ms. Horsky's alleged symptoms and functional limitations. Because the ALJ supported her credibility finding with specific reasons, including the factors set forth in 20 C.F.R. § 404.1529(c), her credibility determinations are entitled to deference.

2.

Ms. Horsky also contends that the ALJ failed to take into account the side effects she allegedly suffered when finding her not credible on the basis that she did not take her prescribed medications (Pl.'s Mem. at 14). It is true that a claimant may have a "good reason" for failing to follow a treatment plan, such as "intolerable side effects." *Shauger*, 675 F.3d at 696. Contrary to Ms. Horsky's claims, however, the ALJ considered the side effects of Ms. Horsky's medications. The ALJ stated that Ms. Horsky claimed that her pain medication makes her sick to her stomach and that her migraine medication makes her loopy (R. 22). The ALJ noted, however, that although Ms. Horsky claimed that she stopped taking Lyrica because of side effects, she never sought a follow-up visit with the rheumatologist to treat any continuing fibromyalgia pain. The ALJ reasonably relied on the ME's conclusion that Ms. Horsky's failure to even seek a follow-up visit with the rheumatologist further diminished her credibility as to her complaints of pain from fibromyalgia (R.

24, 61-62). In addition, while there was evidence in the record that Prozac helped control her migraine headaches, Ms. Horsky nevertheless stopped taking it (*Id.*).

Furthermore, the medical notes documenting Ms. Horsky's side effects from medication were based primarily, if not entirely, on Ms. Horsky's subjective complaints to her doctors. For example, Ms. Horsky argues that the ME's analysis ignored Dr. Gawne's opinion that she could not tolerate prophylactic medications to decrease the frequency of her migraine headaches (Pl.'s Mem. at 9, 14). However, Dr. Gawne was recording Ms. Horsky's own complaints. As explained above, "ALJs may discount medical opinions based solely on the patient's subjective complaints." *Filus*, 694 F.3d at 868.

Taking these factors into consideration, the ALJ reasonably concluded that Ms. Horsky's reports as to the extent of the alleged side effects were not credible, instead finding that they were relatively minor and would not prevent her from working (R. 22). *See Carter v. Astrue*, 413 Fed. App'x 899, 906 (7th Cir. 2011) (affirming decision of ALJ where contrary to claimant's contentions, ALJ did not ignore alleged side effects from medication); *see also Schaaf v. Astrue*, 602 F.3d 869, 874-76 (7th Cir. 2010) (holding that the ALJ did not err in concluding that there was no evidence that any side effects from medications would prevent claimant from working even though ALJ "only briefly" addressed the side effects, because there was no indication in the record that claimant complained of side effects to his doctors or inquired into changing his pain medication); *but cf. Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013) (reversing ALJ opinion that found claimant had exaggerated her ailments because she had rejected certain medications, where ALJ had failed to mention the side effects the claimant complained of from the medication (headaches)).

21

**3.**

Ms. Horsky also argues that the ALJ erred in not finding credible her testimony that she has so much anxiety that she frequently fails to leave the house (Pl.'s Mem. at 15).[6] The ALJ, however, addressed Ms. Horsky's anxiety claim and concluded that despite her testimony to the contrary, the anxiety was not severe according to the Paragraph B criteria, and any limitations from her alleged anxiety were mild (R. 19-20). There was substantial evidence for this conclusion, which the ALJ summarized in her opinion – including evidence that Ms. Horsky reported to her treater (Dr. Gawne) that her anxiety was substantially reduced while taking Prozac and she was sleeping better and able to go out (R. 20, citing R. 425).

We note that Ms. Horsky did not challenge the ALJ's decision that her mental impairment was not severe. In fact, Ms. Horsky only raises the issue of her alleged anxiety once more in her memorandum: in opining that she wanted her husband to stay home with her because of her "extreme anxiety" (Pl.'s Mem. at 14). These brief, undeveloped statements about Ms. Horsky's anxiety are not sufficient to raise a dispute as to the ALJ's Step 2 mental impairment determination for the Court's review. *See Kyles v. J.K. Guardian Sec. Servs.*, 236 F.R.D. 400, 402 (N.D. Ill. 2006) (stating that "skeletal, undeveloped, perfunctory or unsupported arguments are deemed waived"). "[I]t is not this court's responsibility to research and construct the parties' arguments, and conclusory analysis will be construed as waiver." *Carter*, 413 Fed. App'x at 906 (citing *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010)).

---

[6]Specifically, Ms. Horsky argues that the ALJ's failure to give weight to this testimony led her to ignore the VE's testimony that she could not perform full-time work if she would be off-task fifteen percent of the work day (Pl.'s Mem. at 15). The VE's testimony, however was given in response to a question about a hypothetical claimant that would be off-task fifteen percent of the work day. The ALJ determined that Ms. Horsky's testimony that she would be off task this amount of the work day was not credible; thus, the VE's conclusion as to this hypothetical individual was not relevant.

**4.**

Ms. Horsky's remaining arguments as to why the ALJ's adverse credibility decision was erroneous are similarly without merit. *First*, Ms. Horsky argues that the ALJ should not have made an adverse credibility finding based on her testimony that she stopped working because of her sinkhole accident in June 2006, when other evidence in the record indicated that she stopped working in May 2006 (Pl.'s Mem. at 12-13). However, a finding of inconsistencies and contradictions within a claimant's testimony and between a claimant's testimony and other record evidence is a well-settled basis for adverse credibility findings. *See, e.g., Shideler*, 688 F.3d at 312 n.3 (noting that the inconsistency between the claimant's and surgeon's testimony as to how the claimant injured his knee "bolsters the ALJ's finding that [the claimant's] testimony was not entirely credible"); *see also Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) (proof that claimant's testimony was exaggerated and inconsistent was grounds for disbelieving claimant's testimony that she suffered from constant pain).

*Second*, Ms. Horsky contends that the ALJ was "unwarranted" in finding that the lawsuit Ms. Horsky filed over the sinkhole accident provided a motive for her to inflate her symptoms and further undermined her credibility (Pl.'s Mem. at 13). To the contrary, the Seventh Circuit has stated that plaintiffs in civil lawsuits, like "[a]pplicants for disability benefits[,] have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of other evidence in the case." *Johnson*, 449 F.3d at 805. Here, as in *Johnson*, "[d]espite the inherent difficulty of evaluating testimony about pain," the ALJ had "solid grounds for disbelieving [the] claimant who testifies that she has continuous, agonizing pain." *Id.* at 806.

"To be sure, the ALJ's decision was not perfect." *Shideler*, 688 F.3d at 312. However, we do not look for perfection in determining whether an ALJ's credibility determination was patently wrong. Here, the ALJ provided numerous, detailed reasons for finding Ms. Horsky's testimony not credible that "[had] support in the record, and the ALJ was entitled to rely on them." *Filus*, 694 F.3d at 868. Thus, based on our review of the record, we find that the ALJ's credibility determination was supported by substantial evidence and was not patently wrong.

## B.

After finding Ms. Horsky's complaints of pain and functional limitations "far less" than fully credible, there is little documentation left in the record from which the ALJ could find Ms. Horsky disabled. Nevertheless, Ms. Horsky argues that the ALJ erred in adopting the testimony of the ME, because in doing so, the ALJ failed to take into account the full extent of her pain from migraines and fibromyalgia and the side effects from her medications, as documented in notes and medical opinions from her chiropractor, physical therapist, and Dr. Gawne (Pl.'s Mem. at 9-11, 15).

Ms. Horsky, however, points to no countervailing doctor's opinion in the record which she believes the ALJ should have adopted. In fact, neither the ALJ nor the ME rejected the opinions of any of Ms. Horsky's treating physicians, and none of her treating physicians gave an opinion as to her residual functional capacity. Rather, the ME and the ALJ explicitly addressed the opinions of many of Ms. Horsky's treaters.

For example, although Ms. Horsky disputes the ME's characterization of her orthopedic surgeon as "baffled" by her complaints of pain (Pl.'s Mem. at 9, citing R. 58), the surgeon's opinion (as noted by the ALJ and the ME) is not in dispute: that despite some tenderness over her right SI joint, Ms. Horsky had minimal nerve root compression, full flexion, no atrophy or edema, and

24

normal gait and stance, and he did not have surgical options to offer her (R. 59). In addition, the ME reviewed the notes from the few appointments Ms. Horsky had with a physical therapist (R. 59-60), and concluded that the clinical findings were essentially normal and there were no neurological abnormalities (R. 60). The ALJ's opinion also cited reports from Dr. Gawne, Dr. Lim, Ms. Horsky's chiropractor, her rheumatologist, and others. The ALJ found that their opinions did not support Ms. Horsky's allegations of disabling pain and functional limitations.

After looking at the objective medical evidence and Ms. Horsky's testimony, the ALJ reasonably relied on the ME's testimony and concluded that Ms. Horsky's testimony as to her pain and functional limitations was not credible, and she would be able to perform full-time work. The ALJ built an accurate and logical bridge between the evidence and her conclusion, and we affirm the ALJ's determination.

## CONCLUSION

For the reasons stated above, we deny Ms. Horsky's motion to reverse and remand the ALJ's decision (doc. # 15), and grant the Commissioner's motion seeking summary affirmance of that decision (doc. # 20). This case is terminated.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: March 13, 2013